**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| **JONEE LAVERN HENSLEY, Personally, and as Personal Representative of the Estate of WILLIAM ALAN HENSLEY,** | **CIVIL ACTION NO.** 3:26-cv-2287-SAL |
| **Plaintiff,** | **COMPLAINT** <br> **(Jury Trial Demanded)** |
| **vs.** | |
| **TESLA, INC.,** | |
| **Defendants.** | |

Plaintiff, Jonee Lavern Hensley, as Personal Representative of the Estate of William Alan Hensley, (hereinafter "Plaintiff") by and through her attorneys, Bell Legal Group, brings this Complaint against Tesla, Inc., (hereinafter "Defendant") and alleges, based on personal knowledge as to her own actions, and otherwise upon information and belief, as follows:

## JURISDICTION

1. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy, exclusive of interest, attorney fees and costs, exceeds $75,000.00.

## VENUE

2. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

1

**PARTIES**

3.      Plaintiff is a resident and/or citizen of the state of South Carolina and is domiciled in the State of South Carolina.

4.      Jonee Lavern Hensley is the duly appointed personal representative of the Estate of William Alan Hensley. As personal representative of the Estate, the Plaintiff, Jonee Lavern Hensley, has standing to and otherwise is duty bound to bring this wrongful death action pursuant to South Carolina Statute §15-51-10 *et seq.*

5.      At the time of his death, William Alan Hensley (hereinafter "William" or "Mr. Hensley") was 34 years old, was married to Jonee Lavern Hensley ("Plaintiff") and had two children, ages 8 and 5.

6.      Upon information and belief, Defendant is a corporation that is incorporated in Texas and has its principal place of business in Austin, Texas. At all times hereinafter and at the time of the incident complained of, Tesla was in the business of designing, testing, inspecting, manufacturing, distributing, selling, maintaining, repairing and otherwise placing into the stream of commerce, and causing the same to come into the State of South Carolina, certain automobiles, including a certain specific automobile designates and described as a 2016 Tesla Model X, VIN: 5YJXCAE42GF000391 (hereinafter "Subject Vehicle" or "Vehicle").

**FACTS**

7.      On the morning of October 12, 2023, at approximately 6:40 AM, William Hensley was driving eastbound, to work, on Twelve Bridges Road in Sumter, South Carolina, in his 2016 Tesla Model X, VIN: 5YJXCAE42GF000391.

8.      Upon information and belief, in Sumter on the morning of October 12, 2023, there was approximately .07" of rainfall[1] -- a light drizzle.[2]

---

[1] https://www.wunderground.com/history/daily/KSMS/date/2023-10-12
[2] https://www.wunderground.com/history/daily/KSMS/date/2023-10-12

9.      Mr. Hensley's Vehicle came equipped with various automated driving features, including Defendant Tesla's "Autopilot", which allowed the Vehicle to navigate without direct driver input, or so Mr. Hensley believed.

10.     Upon information and belief, Mr. Hensley purchased the Vehicle largely due to Tesla's advertised Autopilot features. Specifically, he sought a vehicle that would offer substantial driving assistance and relied on Tesla's marketing and advertisements in believing that the Vehicle would provide such assistance. Upon information and belief, Mr. Hensley was utilizing and relying on the Autopilot feature during his commute to work, as he routinely did.

11.     During his commute, Mr. Hensley activated the Autopilot function in his Vehicle and was relying on its ability to properly steer and navigate the vehicle, to detect obstacles in the roadway ahead of the Vehicle and to reduce speed and/or come to a complete stop when such obstacles were detected.

12.     As the Vehicle approached a slight -bending curve in the road, it continued traveling straight at a consistent speed, ultimately veering off the roadway, striking multiple trees before overturning and combusting into flames.

13.     Upon information and belief, the Subject Vehicle's Autopilot feature failed to recognize and/or detect the bend in the road and failed to adjust its speed or direction accordingly.

14.     Upon information and belief, despite wearing his seatbelt, Mr. Hensley was ejected approximately fifteen (15) feet from the Vehicle. The side of the Vehicle where the seatbelt anchored was completely sheared off due to the severity of the impact.

15.     Mr. Hensley sustained fatal injuries and was pronounced dead at the scene of the accident. His cause of death was determined to be blunt force trauma.

**FLAWED AUTOPILOT DESIGN & FUNCTION**

16.     Since at least September 2014, Defendant has manufactured, marketed, and sold vehicles equipped with the Autopilot feature.

17.     Autopilot is the simultaneous use of the features that Tesla calls Traffic-Aware Cruise Control (TACC) and Autosteer. [3]

18.     TAAC is a type of adaptive cruise control that, like traditional cruise control, maintains a set speed but also slows or accelerates as necessary to maintain the vehicles following distance from a vehicle in front. [4]

19.     As designed, Autosteer detects lane markings and the presence of other nearby vehicles and objections to keep the vehicle in its driving lane. [5]

20.     According to the National Highway Traffic Safety Administration ("NHTSA" ), a vehicle's designation as SAE Level 2 (Partial Automation) means a driver-assistance system that can control steering and speed simultaneously but requires continuous human supervision, with the driver retaining responsibility for monitoring the roadway and for safe operation of the vehicle at all times.

21.     At all relevant times, the Decedent's Tesla vehicle was equipped with driver-assistance features that fall within SAE Level 2, meaning the system required continuous driver supervision and did not operate as an autonomous or self-driving vehicle.

---

[3] INCLA-EA22002-14498.pdf
[4] Id.
[5] Id.

22.    Upon information and belief, Defendant's Autopilot system was designed and intended for use on multi-lane roadways with clear lane markings[6] and not for roadways with cross-traffic or intersections.

23.    Defendant designed its Autopilot system for controlled-access highways, yet knowingly allowed, enabled, and encouraged drivers to activate and rely upon Autopilot on surface streets, intersections, and roadways containing cross-traffic, stop controls, and pedestrians, where Tesla knew the system could not reliably perceive or respond to hazards, causing injuries and fatalities to unsuspecting individuals, including Mr. Hensley, who did not consent to participate in Defendant's real-world testing of experimental technology.

24.    Defendant advertises that use of its Autopilot feature results in less accidents, thereby inducing and encouraging drivers to trust and increasingly rely on, the Autopilot feature[7].

25.    Despite these advertisements, Defendant was aware of fatal collisions that occurred when Autopilot was used outside its intended operational areas and knew that drivers would likely overestimate the system's capabilities, leading to fatal crashes.

26.    Upon information and belief, Tesla advertised their Autopilot feature in a way that greatly exaggerated its capabilities and in turn hid its deficiencies. Rather than taking appropriate steps to ensure the safety of its customers and others, Tesla and its CEO, Elon Musk, repeatedly made the intentional decision to continue encouraging Tesla drivers to over-rely on its Autopilot system.

---

[6] "Autopilot features are intended for use on multi-lane roadways with clear lane markings." https://www.tesla.com/support/autopilot#difference

[7] "As shown in our Vehicle Safety Report, Tesla vehicles using Autopilot and FSD (Supervised) tend to crash significantly less than the national average. In Q2 2025, we recorded one crash for every 6.69 million miles driven in which drivers were using Autopilot technology. For Tesla drivers who were not using Autopilot technology, we recorded one crash for every 963,000 miles driven. By comparison, the most recent data available from NHTSA and FHWA (from 2023) shows that in the United States there was an automobile crash approximately every 702,000 miles." https://www.tesla.com/support/autopilot#difference

27.     Despite falsely advertising its vehicles as safer due to Autopilot, and deliberately leading consumers to believe the system would provide a safer driving experience, Defendant Tesla has the highest fatal accident rate of any vehicle brand.[8]

28.     Defendant knew that drivers using Autopilot performed worse than those manually driving when responding to sudden lane departures, with slower reaction times, longer durations outside their lane, and less effective corrective steering. [9]

29.     Despite Defendant's knowledge of the dangerous misconceptions its product created, Defendant did not alter its advertising practices, nor did it reprogram the Autopilot system to prevent use on roads for which it was not designed.

30.     Defendant was aware that the name of their self-driving feature, Autopilot, misled users and signaled to drivers that they could turn their thoughts and their eyes elsewhere.[10]

31.     Despite knowing the confusion the term "Autopilot" caused consumers, Defendant failed to reconsider or revise the messaging and naming of the system.

32.     Defendant was aware that the Autopilot feature its use of the term "Autopilot" misled users at an increased rate compared to other similar features on the market.[11]

---

[8] "Tesla also has the highest fatal accident rate by brand, followed by Kia, Buick, Dodge, and Hyundai" https://www.iseecars.com/most-dangerous-cars-study#v=2024

[9] https://pubmed.ncbi.nlm.nih.gov/28454860/#:~:text=In%20addition%20to%20driving%20performance,drivers'%20performance%20under%20these%20conditions.

[10] "Despite the limitations of today's systems, some of their names seem to overpromise when it comes to the degree to which the driver can shift their attention away from the road. One name in particular — Autopilot — signals to drivers that they can turn their thoughts and their eyes elsewhere, an IIHS survey found." https://www.iihs.org/news/detail/new-studies-highlight-driver-confusion-about-automated-systems

[11] "When asked whether it would be safe to take one's hands off the wheel while using the technology, 48 percent of people asked about Autopilot said they thought it would be, compared with 33 percent or fewer for the other systems. Autopilot also had substantially greater proportions of people who thought it would be safe to look at scenery, read a book, talk on a cellphone or text. Six percent thought it would be OK to take a nap while using Autopilot, compared with 3 percent for the other systems." https://www.iihs.org/news/detail/new-studies-highlight-driver-confusion-about-automated-systems

33.    Rather than taking appropriate steps to ensure the safety of its customers and others, Defendant and its CEO, Elon Musk, made the intentional decision to continue encouraging Tesla drivers to over-rely on its Autopilot system.

34.    Despite Defendant's knowledge of its unique position and the leading vehicle manufacturer to mislead and confuse its consumers about an important safety matter, it did not change its practices to align with that of the industry, thus prioritizing fast innovation at the expense of fatal endangerment.

35.    Upon information and belief, Defendant chose to continue profiting from the sales of their defective vehicles and software systems rather than heed warnings from government agencies, experts, and other car companies.

## DECEMBER 12, 2023, AUTOPILOT RECALL AND DEFENDANT'S RESPONSE

36.    On December 12, 2023, approximately one month after the fatal accident that took Mr. Hensley's life, the National Highway Traffic Safety Administration (NHTSA) submitted its Part 573 Safety Recall Report, identified as Recall No.  23V-838.

37.    This recall recalled nearly all Tesla vehicles manufactured since 2012, potentially 2,031,220 vehicles, with an estimated 100% of those vehicles having a defect.[12]

38.    This recall stemmed from years of NHTSA investigations, beginning with a Preliminary Evaluation (PE21-020) initiated on August 13, 2021. That investigation focused on eleven incidents involving Tesla vehicles operated with Autopilot's Autosteer feature, that collided with stationary first-responder vehicles. .[13]

---

[12] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V838-8276.PDF
[13] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V838-8276.PDF

39.     On June 8, 2022, NHTSA escalated PE21-020 to an Engineering Analysis (EA), specifically EA22-002, to study the potential for driver misuse when the Autopilot's Autosteer function was engaged.

40.     On December 5, 2023, Defendant decided to voluntarily administer a recall and provide an over-the-air software update to address NHTSA's concerns, though it did not agree with the agency's analysis in the engineering evaluation. NHTSA partially described the Autopilot defect by stating: "In certain circumstances when Autosteer is engaged, the prominence and scope of the feature's controls may not be sufficient to prevent driver misuse of the SAE Level 2 advanced driver-assistance feature."[14]

41.     Regarding the safety risk, NHTSA explained: "In certain circumstances when Autosteer is engaged, if a driver misuses the SAE Level 2 Advanced driver-assistance feature such that they fail to maintain continuous and sustained responsibility for vehicle operation and are unprepared to intervene, fail to recognize when the feature is canceled or not engaged, and/or fail to recognize when the feature is operating in situations where its functionality may be limited, there may be an increased risk of a collision."[15]

42.     Despite the NHTSA recall, Defendant continues to allow drivers to use its Autopilot system in environments where it is not designed to operate safely and where protections against foreseeable misuse remain inadequate.

43.     Defendant Tesla's recall merely involved an over-the-air software update that provided additional warnings when the Autopilot system sensed driver inattention.

44.     However, even with these visual and audible alerts, the update was insufficient and long overdue.  Defendant has been aware since at least September of 2016 that its driver warning system was grossly inadequate and fundamentally flawed.

---

[14] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V838-8276.PDF
[15] https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V838-8276.PDF

45.     At a press conference on September 11, 2016, Tesla CEO Elon Musk acknowledged that some drivers become too comfortable using Autopilot, stating: "so we will see half a dozen or more, sometimes as many as 10 warnings in the space of an hour continuously ignored by the driver. So, we really want to avoid that situation."[16]

46.     Defendant's response to the NHTSA's findings raises serious concerns about whether it has adequately addressed, or will ever effectively address, the defects in its Autopilot system.

47.     Although Defendants claim to have fully complied with the NHTSA recall, its software updates have done little, if anything, to address the regulator's concerns. According to Consumer Reports, "Tesla's remedy addresses minor inconveniences rather than fixing the real problems."[17]

48.     Moreover, despite the NHTSA's findings, Defendant has not agreed to restrict the use of Autosteer to controlled-access highways, roads for which the technology was specifically designed.

49.     Although Defendant has repeatedly been notified of its need to guard against misuse of its Autopilot system [18] and despite the NHTSA's recall, Defendant steadfastly refused to restrict operations of Autopilot and Autosteer to the areas in which this technology was designed to operate.

### DEFENDANT'S HISTORY OF PROMOTING OVERRELIANCE

50.     At a Tesla press conference on October 14, 2015, while announcing the release of Autopilot v7.0, CEO Elon Musk stated: "The forward-facing camera is able to determine where

---

[16] https://electrek.co/2016/09/11/transcript-elon-musks-press-conference-tesla-autopilot-under-v8-0-update-part-2/
[17] https://www.consumerreports.org/cars/car-safety/tesla-autopilot-recall-fix-does-not-address-safety-problems-a5133751100/
[18] https://www.consumerreports.org/cars/car-safety/tesla-autopilot-recall-fix-does-not-address-safety-problems-a5133751100/

the lanes are, where the cars are ahead of it, and it's also able to read signs. It's been able to read speed signs for a while, for example, but it's able to read pretty much any sign. Then that's combined with the forward radar. The radar is very good at detecting fast moving large objects, and it can actually see through fog, rain, snow, and dust. So, the forward radar gives the car superhuman sensors. It can see through things that are close to the car."[19]

51.    Much of the preceding statement was false or grossly exaggerated. No version of Autopilot has ever been able to read "pretty much any sign".

52.    Musk's comments implied that Tesla's system could recognize road endings, avoid fixed obstacles and see through rain, snow and dust.  This statement made approximately eight years before the subject incident, clearly implied that this "ever-improving" system would recognize the end of a road or a tree and be able to "see through" rain and other objects. Defendant knew its Autopilot system could do no such things.

53.    After Elon Musk's statements, the NHTSA continually called for more prominence and scope regarding Tesla's Autopilot features in order to prevent misuse. The NHTSA inquiry speaks volumes about Defendant's unwillingness to be clear and truthful about Autopilot's capabilities. Defendant's continued flagrant disregard of NHTSA's autopilot recall clearly advertises its gross indifference to safety.

54.    Tesla failed to incorporate reasonable design safeguards—such as geofencing, road-type restrictions, or forced disengagement—that would have prevented Autopilot from being used in environments Tesla knew posed an unreasonable risk of serious injury or death.

55.    Other statements over the years that encouraged overreliance on Defendant's defective Autopilot feature further reinforced the defect pointed out by NHTSA and underscore Defendant's continued indifference to correcting this defect.

---

[19] Tesla Press Conference for the Autopilot v7.0 Software, at approximately time 00:03:46 to 00:04:26.

56.     Approximately seven years before the subject incident, on October 19, 2016, Tesla CEO Elon Musk stated: "The basic news is that all Tesla vehicles exiting the factory have the hardware necessary for Level 5 Autonomy."[20]

57.     As part of an October 2016 event, Tesla posted a video, set to the Rolling Stones' song "Paint It Black", demonstrating what it purported to be the self-driving capabilities of its Autopilot system. The video opens with the caption: "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself."[21]

58.     Six years after posting this video, which still contains no disclaimer that the video does not depict the capabilities of any vehicle Tesla has ever sold, Tesla's head of Autopilot testified that the video did not represent the true capabilities of the car. He admitted that the video was staged and that the vehicle used in the video crashed into a fence during one of the video outtakes.[22]

59.     Further, Tesla's CEO, Elon Musk, stated in 2016, "Model S and Model X, at this point, can drive autonomously with greater safety than a person. Right now."[23]

60.     Musk and Defendant Tesla blurred any distinction between the "Autopilot" features and the "full-self-driving" capabilities, exaggerating both far beyond their actual capabilities or SAE Level 2 designation, which

61.     In interviews with reporters on October 19, 2016, Tesla's CEO Elon Musk stated, "we will be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically, from home in LA to let's say dropping you off in Times Square, NY,

---

[20] https://xautoworld.com/news/transcript-elon-musk-autopilot-2-conference-call/#:~:text=Elon%20Musk:%20Basic%20news%20is,driving%20for%20driver%2Dless%20capability.
[21] https://vimeo.com/188105076
[23] https://www.theverge.com/2023/4/27/23700339/tesla-autopilot-lawsuit-2018-elon-musk-claims-deepfakes
[23] https://www.theverge.com/2023/4/27/23700339/tesla-autopilot-lawsuit-2018-elon-musk-claims-deepfakes

and then having the car parking itself by the end of next year (2017) without the need for a single touch including the charger."[24]

62.     In 2018, Musk announced that within months, "full-self-driving" features would be added to Defendants vehicles, including Mr. Hensley's Vehicle, through an online update in the vehicle software.[25]

63.     On April 12, 2019, Musk claimed, "I'd be shocked if it's not next year, at the latest, that having a human intervene will decrease safety."[26]

64.     Defendant's descriptions of its various autonomous features, including the defective Autopilot/Autosteer feature that Mr. Hensley was relying on the morning of his fatal accident, have consistently evinced Defendant's *desire* is for its customers to *believe* that all Tesla vehicles have, or will imminently gain, autonomous systems enabling Tesla vehicles to operate without human involvement.

65.     Despite its clear SAE Level 2 (Partial Automation) designation, Defendant deliberately blurred the distinction between whether its automation system is merely a "driver assist" system or a fully autonomous system that does not require the driver's constant attention.[27]

66.     One reason for Defendant's ambiguity as to the level of autonomy available in its vehicles, including Mr. Hensley's vehicle, is that without substantially more rigorous testing and

---

[24] In a conference call with reporters: Elon Musk Autopilot 2.0 Conference Call Transcript, XAUTOWORLD Oct. 19, 2016, http://www.xautoworld.com/Tesla/transcript-elon-musk-autopilot-2-conference-call/ (last accessed Aug. 26, 2025)

[25] https://electrek.co/2018/06/10/tesla-version-9-software-update-fully-self-driving-features-elon-musk/

[26] Lex Fridman, Interview: Elon Musk: Tesla Autopilot | Lex Fridman Podcast #18, at 21:27–24:26 Apr. 12, 2019, https://www.youtube.com/watch?v=dEv99vxKjVI&t=281s

[27] https://www.jurist.org/commentary/2021/09/william-widen-philip-koopman-autonomous-vehicles/

development, Defendant cannot openly sell a vehicle that does not require the driver's constant attention.[28]

67.    Thus, Defendant has sought to convince its prospective and previous customers, including Mr. Hensley, that Tesla's vehicles have, or will soon have, the ability to "drive themselves", while simultaneously telling regulators that Defendant only sells vehicles that require constant driver attention, with the same driver-assist features used by other automakers.[29]

**DEFENDANT USES ITS UNTRAINED CUSTOMERS TO "TRAIN" AUTOPILOT**

68.    One of the key differences between Defendant's development of its automated features and others in the automotive industry is Defendant's use of drivers in the field, *its customers*, to "train" the computer system to master the tasks necessary to safely navigate the complex, largely unpredictable nature of driving a car in real-world traffic.[30]

69.    At the time of Mr. Hensley's fatal accident – and continuing to this day – Defendant's Autopilot system was, and remains, in "beta" testing. It has never been a finalized product and has consistently been treated by Defendant as a work in progress.

70.    Instead, Autopilot is still being tested and developed by ordinary drivers in traffic situations and interacting with others who have in no way consented to participating in Defendant's testing process.[31]

71.    The first fatality involving Autopilot occurred in May 2016—nearly seven years before Mr. Hensley's incident. Since then, Defendant has continued to use untrained customers to beta-test its system and has failed to take reasonable steps to prevent foreseeable misuse— misuse that is not only predictable but actively encouraged by Defendant. Defendant is the only

---

[28] https://www.jurist.org/commentary/2021/09/william-widen-philip-koopman-autonomous-vehicles/
[29] https://www.jurist.org/commentary/2021/09/william-widen-philip-koopman-autonomous-vehicles/
[30] https://www.cbsnews.com/video/the-state-of-self-driving-cars/#x
[31] Elon Musk, *Tesla Autonomy Day 2019 – Full Self-Driving Autopilot – Complete Investor Conference Event*, at 2:13:18-2:13:32, Apr. 23, 2019, https://www.youtube.com/watch?v=Ucp0TTmvqOE&t=4453s

carmaker that beta-tests its Advanced Driver Assist System on the public.[32] This was true in 2016 and its remains true today. "Every other automaker – from BMX to Cadillac – flat-out refuses to beta-test driverless tech on the public."[33]

## FEDERAL AGENCIES HAVE REPEATEDLY CALLED ATTENTION TO DEFENDANT'S FALSE ADVERTISING

72.     Long before Mr. Hensley's  tragic incident, advocates and federal agencies repeatedly demanded the Federal Trade Commission act on Defendant's  false advertising regarding its automated driving systems.[34]

73.     In 2018, the Center for Auto Safety and Consumer Watchdog wrote to then-FTC Chairman Joseph Simons urging the FTC to investigate Defendant's deceptive and unfair practices in the advertising and marketing of Autopilot after two fatal crashes.[35]

74.     The Auto Safety and Consumer Watchdog renewed their request to the FTC in 2019 after several more fatal crashes caused by Defendants defective Autopilot feature.[36]

75.     On August 13, 2021, NHTSA opened a formal investigation into Defendant's Autopilot feature after identifying eleven crashes since 2018 involving Tesla vehicles with Autopilot engaged, in which the vehicles collided with first responder sites.[37]

---

[32] https://mashable.com/article/tesla-beta-testing-autopilot-on-public
[33] https://mashable.com/article/tesla-beta-testing-autopilot-on-public
[34] 18 August 2021 Letter from the United States Senate to The Honorable Lina Khan, Chair, Federal Trade Commission, https://www.blumenthal.senate.gov/imo/media/doc/2021.08.18%20-%20FTC%20-%20Tesla.pdf
[35] May 23, 2018, Letter from the Center for Auto Safety to Hon. Joseph Simons, Chair FTC, https://www.autosafety.org/wp-content/uploads/2018/05/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising.pdf
[36] July 25, 2019, Letter from the Center for Auto Safety to Hon. Joseph Simons, Chair FTC, https://www.autosafety.org/wp-content/uploads/2019/07/CAS-and-CW-Letter-to-FTC-on-Tesla-Deceptive-Advertising-2019-FINAL.pdf
[37] https://static.nhtsa.gov/odi/inv/2021/INOA-PE21020-1893.PDF

76.     Tesla failed to timely preserve, disclose, and accurately represent vehicle and Autopilot data following crashes, thereby impeding prompt identification of system failures and delaying accountability.

77.     As part of their investigation into the first responder crashes, NHTSA requested Defendant Tesla to provide responses to various information requests,[38] and Tesla has sought to conceal their responses from the public.[39]

78.     Following the NHTSA investigation and mounting questions about the safety of Defendant's autonomous driving software and marketing, Defendant announced in September 2021 it would be *expanding* the availability of its Full Self-Driving feature.

79.     In response to this announcement, National Transportation Safety Board (NTSB) chair, Jennifer Homendy, said in an interview with the Wall Street Journal, "basic safety issues have to be addressed before they're then expanding it to other city streets."[40] Homendy called Defendant's decision to call its system "Full Self-Driving" "misleading and irresponsible."[41] Homendy further pointed out that people pay more attention to marketing than to warnings. buried in car manuals or on a company's website.[42]According to Homendy, "[Tesla] has clearly misled numerous people to misuse and abuse technology."[43]

---

[38] National Highway Traffic Safety Administration [NHTSA] Letter to Eddie Gates, Director, Field Quality, Tesla, Inc., August 31, 202, https://static.nhtsa.gov/odi/inv/2024/INIM-PE24031-62887.pdf
[39] https://static.nhtsa.gov/odi/inv/2021/INME-PE21020-1022.pdf
[40] Rebecca Elliott, *Elon Musk's Push to Expand Tesla's Driver Assistance to Cities Rankles a Top Safety Authority*, WALL ST. J. Sept. 19, 2021, wsj.com/articles/elon-musks-push-to-expand-teslas-driver-assistance-to-cities-rankles-a-top-safety-authority-11632043803?mod=hp_lead_pos3
[41] Rebecca Elliott, *Elon Musk's Push to Expand Tesla's Driver Assistance to Cities Rankles a Top Safety Authority*, WALL ST. J. Sept. 19, 2021, wsj.com/articles/elon-musks-push-to-expand-teslas-driver-assistance-to-cities-rankles-a-top-safety-authority-11632043803?mod=hp_lead_pos3
[42] Rebecca Elliott, *Elon Musk's Push to Expand Tesla's Driver Assistance to Cities Rankles a Top Safety Authority*, WALL ST. J. Sept. 19, 2021, wsj.com/articles/elon-musks-push-to-expand-teslas-driver-assistance-to-cities-rankles-a-top-safety-authority-11632043803?mod=hp_lead_pos3
[43] Rebecca Elliott, *Elon Musk's Push to Expand Tesla's Driver Assistance to Cities Rankles a Top Safety Authority*, WALL ST. J. Sept. 19, 2021, wsj.com/articles/elon-musks-push-to-expand-teslas-driver-assistance-to-cities-rankles-a-top-safety-authority-11632043803?mod=hp_lead_pos3

80.    Additionally, NHTSA issued a Special Order Directed to Tesla, Inc., on October 12, 2021, ordering Defendant to produce various documents related to purported non-disclosure agreements between Defendant and its customers that prohibited or discouraged customers from sharing certain information relevant to the performance of Full Self-Driving.[44]

81.    Prior to the most recent recall involving all Tesla vehicles, NHTSA ordered Defendant to recall more than 362,000 U. S. vehicles to update its Full Self-Driving (FSD) beta software after U.S. regulators found the system did not adequately adhere to traffic safety laws and could cause crashes.[45]

82.    Although this recall attracted international attention, Defendant has routinely issued online 'updates' to its automated features—for example, in late September 2021, Defendant released a software update to enhance its vehicles' ability to detect emergency vehicle lights in low-light conditions. Shortly thereafter, NHTSA formally reminded Defendant that "the Safety Act imposes an obligation on manufacturers of motor vehicles and motor vehicle equipment to initiate a recall by notifying NHTSA when they determine vehicles or equipment they produced contain defects related to motor vehicle safety or do not comply with an applicable motor vehicle safety standard."[46]

83.    Over the past several years, Defendant has issued numerous updates to its autonomous driving systems. If these updates were aimed at improving vehicle safety, they would more appropriately be classified as 'recalls.' Many of these relatively secretive updates deserved the same level of international attention as the most recent one. By avoiding such scrutiny, Defendant has largely escaped the reputational harm and regulatory oversight that typically accompany formal recalls. Additionally, the California Department of Motor Vehicles

---

[44] National Highway Traffic Safety Administration [NHTSA] Letter & Special Order Directed to Tesla, Inc., to Bill Berry, Vice President, Legal, Tesla, Inc. (Oct. 12, 2021) https://static.nhtsa.gov/odi/inv/2021/INOT-PE21020-85593P.pdf
[45] https://www.reuters.com/business/autos-transportation/tesla-recalls-362000-us-vehicles-over-full-self-driving-software-2023-02-16/
[46] Letter from Gregory Magno, Chief Vehicle Defects Division – D Office of Defects Investigation, NHTSA, to Eddie Gates, Director, Field Quality, Tesla, Inc., (October 12, 2021) https://static.nhtsa.gov/odi/inv/2021/INIM-PE21020-85573P.pdf

accused Defendant of false advertising in its marketing of the company's signature Autopilot and Full Self-Driving technologies, alleging that Defendant misled consumers regarding the true capabilities of its self-driving systems.[47]

84.    The issues associated with partially automated driver assist systems, such as Defendant's Autopilot, have been recognized within the automotive industry for decades.[48] Drivers tend to "drift off" and lose what experts call "situational" or "contextual" awareness.[49] Reaction time, especially in emergencies, substantially increases when driver assist features are in use.[50] This delay becomes more pronounced as the level of automation rises.[51]

85.    The trust carefully cultivated by Defendant and its representatives poses serious risks when the automated system fails unexpectedly. Defendant has knowingly and falsely promoted the belief that Tesla vehicles can detect and safely respond to hazardous situations—capabilities the vehicles do not actually possess. Defendant, through its marketing and the repeated assurances of its CEO, actively promotes the belief that Tesla vehicles are capable of driving themselves. This messaging encourages drivers to relinquish control. As a result, drivers continue to unknowingly place themselves in greater danger than if they were using traditional driver assistance features or driving manually.

### COUNT #1 – Strict Products Liability in Violation of South Carolina Code § 15-73-10 (DEFECTIVE DESIGN)

86.    Plaintiff repeats and realleges paragraphs 1-87_ hereof, as if fully set forth herein.

---

[47] https://abc7news.com/post/california-dmv-claims-tesla-misled-drivers-driving-capabilities-looks-suspend-business-30-days/17234677/

[48] https://pubmed.ncbi.nlm.nih.gov/10048306/ (See FN #40 in consolidated FL case complaint)

[49] Id to FN 47…

[50] See, e.g., Cruise Control and Speed Limiters Impact Driver Vigilance, VINCI AUTOROUTES FOUND. (July 12, 2013); Young, M. S., & Stanton, N. A., Back to the future: Brake reaction times for manual and automated vehicles, 50 ERGONOMICS, 46–58 (2007) (See FN # 42 in FL complaint)

[51] Eriksson, A., & Stanton, N. A., Takeover Time in Highly Automated Vehicles: Noncritical Transitions to and From Manual Control, HUMAN FACTORS, June 2017, at 689–90. (See FN # 43 from FL complaint)

87. At all material times, Defendant was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including Mr. Hensley's Vehicle equipped with Defendant's Autopilot system.

88. Defendant manufactured, designed, assembled, tested, inspected, marketed, distributed, and sold their vehicles -- including Mr. Hensley's Vehicle -- and its component parts, including the Defendant's Autopilot system and suite of driver assistance technologies with defects in design which rendered them dangerous, hazardous, and unsafe for their intended and reasonably foreseeable use.

89. Defendant's vehicles – including Mr. Hensley's vehicle equipped with Defendant's Autopilot feature – contained design defects at the time they were introduced into the stream of commerce by Defendant.

90. Mr. Hensley was using the Vehicle and its Autopilot features in an intended or reasonably foreseeable manner when the Vehicle veered off the road, resulting in his death. Hensley's Vehicle was defective and unsafe for its intended use.

91. Due to the design defects listed below, Mr. Hensley's Vehicle failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

92. At all material times, Defendant knew and intended that consumers would use and drive their vehicles equipped with Defendant's Autopilot features as Mr. Hensley did on October 12, 2023.

93. The design defects in Mr. Hensley's vehicle, including those in Defendant's Autopilot system, consisted of defective and unsafe characteristics, including but not limited to the following:

(a)     The failure to adequately monitor and determine driver engagement;

(b)     The failure to adequately detect and respond to obstacles in the Vehicle's path;

(c)     The failure to adequately respond to the end of a roadway;

(d)     The failure to adequately respond to the lack of a roadway;

(e)     The failure to adequately ensure the safety of the Autopilot system before putting it on the market;

(f)     The failure to include adequate warnings if the Autopilot system encounters conditions making it unsafe to use the system;

(g)     The failure to ensure adequate takeover time for the driver in the event of an Autopilot system failure;

(h)     The failure to restrict the ability of drivers, including Mr. Hensley, to use Autopilot in areas outside which Defendant designed the Autopilot system to operate safely, also known as "geofencing."

(i)     The failure to implement robust driver monitoring, allowing inattentive or distracted driving;

(j)     The failure to identify stopped emergency or civilian vehicles;

(k)     The failure to ensure driver readiness before system disengagement; and

(l)     The failure to include radar, resulting in Autopilot failing to detect vehicles, pedestrians, or stopped objects accurately in low visibility.

19

94.     Defendant failed to satisfy the reasonable expectations of consumers by placing into the stream of commerce Mr. Hensley's Vehicle that was not equipped with an Autopilot system incorporating fundamental safety features. Such features reasonably include, but are not limited to:

(a)     ensuring the Vehicle remains within designated travel lanes;

(b)     relying on steering-wheel torque as the primary mechanism to assess driver attentiveness, despite internal knowledge that such a system fails to detect visual distraction, cognitive disengagement or over-reliance on automation.

(c)     adjusting vehicle speed to correspond with prevailing traffic conditions;

(d)      maintaining proper lane discipline;

(e)     restricting the activation or operation of Autopilot functionalities in conditions or environments where their use would be unsafe or unsupported; and

(f)     implementing effective active collision avoidance and automatic emergency braking systems capable of detecting and avoiding collisions with objects in the vehicle's path.

95.     As a result of the omissions of the aforementioned safety systems, features, and components, Mr. Hensley's vehicle failed to perform in a manner that an ordinary and reasonable consumer would expect under foreseeable conditions of use.

96.     Additionally, the risk of danger in the design of Mr. Hensley's vehicle and the corresponding Autopilot feature outweighed any benefits of the design, particularly given the availability of safer alternative designs at the time of manufacture.  Such reasonably safer alternative designs include, but are not limited to, the following:

20

(a)    Driver-facing cameras that would monitor the driver's eyes and/or head position as a way to determine driver engagement and awareness, and effectively alert the driver if the driver became inattentive to driving tasks;

(b)    Light Detection and Ranging ("LIDAR") or any other reasonable alternative system that may or may not include the use of radar technology for the detection of obstacles, road features, the end of a road, or a tree in the path of a Tesla vehicle, to include Mr. Hensley's vehicle;

(c)    Effective driver alert systems that would notify drivers, including Mr. Hensley, if road or weather conditions rendered the use of the Autopilot features unsafe;

(d)    Effective driver alert systems that would notify the driver, including Mr. Hensley, of any impending obstacles in the Vehicle's path including but not limited to obstacles, road features, the end of a road, or a tree;

(e)    Effective restrictions blocking the availability of Autopilot features in unsafe conditions, using methods such as geofencing;

(f)    Effective Automatic-Emergency-Braking systems that would safely stop the Vehicle before striking objects, vehicles, or the like in its pathway;

(g)    Effective driver alert systems that would timely notify the driver, including Mr. Hensley, if the Autopilot system was in any way impaired or malfunctioning; and

(h)    Effective driver alert systems that would timely notify the driver, including Mr. Hensley, of an imminent need to take over the steering and braking functions of the vehicle if necessary to avoid a collision.

97.    Therefore, Mr. Hensley's Vehicle equipped with Defendant's Autopilot system presented a substantial and unreasonable risk of serious injury to Mr. Hensley and the public.

98.     Further, the design defects of Mr. Hensley's Vehicle were the direct and proximate cause of Mr. Hensley's death and the resulting damages alleged herein.

99.     Moreover, Defendant's Autopilot system contained unreasonably dangerous design defects which Tesla knew or should have known posed foreseeable risks to users like Mr. Hensley, and feasible alternative designs were available but not implemented. These defects were the proximate cause of Mr. Hensley's death.

**WHEREFORE**, Plaintiffs respectfully demand judgment against Defendant for all damages available under South Carolina law, including compensatory damages, together with post-judgment interest and all taxable costs incurred in this action.

## COUNT #2 – STRICT PRODUCTS LIABILITY in Violation of South Carolina Code § 15-73-10
### (FAILURE TO WARN)

100.    Plaintiff repeats and realleges paragraphs 1-101 hereof, as if fully set forth herein.

101.    At all material times, Defendant was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including Mr. Hensley's Vehicle equipped with Defendant's Autopilot system.

102.    On October 12, 2023, Mr. Hensley was operating his vehicle in a reasonably foreseeable manner, and upon information and belief, had the Defendant's Autopilot system engaged. Despite this, the vehicle failed to detect that it was veering off Twelve Bridges Road and did not recognize multiple trees and other obstacles directly in its path. As a result of these failures, the vehicle left the roadway, causing Mr. Hensley to be ejected from the vehicle and to suffer fatal injuries.

103.    At all relevant times, Defendant knew or should have known that consumers would use, misuse, or operate their Autopilot-equipped vehicles in the same or similar manner as Mr. Hensley did in the time leading up to the collision in question.

104.    An ordinary consumer, such as Mr. Hensley, would not have—and did not—recognize the potential risks and dangers inherent in operating the Vehicle with Autopilot engaged, including the inability of the Vehicle to detect and avoid veering off the roadway or colliding with trees and other obstacles directly in its path.

105.    Due to Defendant's misleading product names and repeated misrepresentations regarding the capabilities of its driver-assistance systems, it would be unreasonable to expect an ordinary consumer to fully understand or recognize the potential risks and limitations associated with operating a Tesla vehicle while Autopilot is engaged.

106.    Defendant Tesla brands its driver-assistance features as "Autopilot," "Enhanced Autopilot," and "Full Self-Driving"—terms that strongly suggest fully autonomous capabilities. In reality, these systems are classified as Level 2 automation, meaning they require the driver's full attention at all times and cannot safely operate the vehicle without continuous human oversight.

107.    As a result of Tesla's branding and marketing practices, ordinary consumers such as Mr. Hensley would not reasonably expect the vehicle to disengage unexpectedly or fail to detect roadway hazards. These expectations were shaped by Tesla's own statements and omissions regarding the functionality and reliability of the Autopilot system.

108.    Mr. Hensley's Vehicle, which was equipped with Defendant's Autopilot system, was unreasonably dangerous for consumer use without adequate warnings or instructions regarding the system's limitations, capabilities, and the need for constant driver intervention.

109.    The design and functionality of Defendant's Autopilot system created foreseeable risks of serious injury or death—particularly in situations where the system could fail to detect hazards, veer off the roadway, or inadequately alert the driver to disengage or take control.

110.    Defendant failed to provide clear, prominent, and sufficient warnings to inform users like Mr. Hensley of the limitations and potential failures of the Autopilot system, including its inability to consistently recognize and avoid obstacles or roadway departures. As a result, placing the product in the stream of commerce without such warnings rendered the Vehicle defective and unreasonably dangerous at the time of sale and use.

111.    Defendant's failure to clearly and prominently warn users that the Autopilot system could disengage unexpectedly or fail to detect hazards on the roadway, combined with its misleading marketing, deprived ordinary customers – including Mr. Hensley – of critical information necessary to safely operate the vehicle.

112.    As a direct and proximate cause of Defendant's inadequate warnings, Mr. Hensley was unaware of the true limitations and risks of the Autopilot system, which contributed to his reliance on the system and ultimately led to the fatal incident.

113.    The absence of sufficient warnings rendered the Vehicle unreasonably dangerous at the time it was placed into the stream of commerce, making Defendant liable for the damages caused by its failure to warn.

114.    At all relevant times, Defendant failed to provide reasonable and adequate warnings or instructions regarding the dangers and limitations inherent in the use of its Autopilot functions, even when such functions were operated in a reasonably foreseeable manner by consumers, including Mr. Hensley. As a direct and proximate result of Defendant's failure to warn consumers—including Mr. Hensley—about the design defects and risks associated with its Autopilot system, the Vehicle's undisclosed dangers caused the fatal incident and resulting damages alleged herein.

24

## COUNT #3 – STRICT PRODUCTS LIABILITY in Violation of South Carolina Code § 15-73-10
## (DEFECTIVE MANUFACTURE)

115.    Plaintiff re-alleges the foregoing as if fully set forth herein.

116.    Mr. Hensley's Vehicle was delivered to him in substantially the same condition as when it was originally sold by Defendant, without any significant alterations or modifications.

117.    At all material times Defendant was engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, inspecting, warranting, leasing, renting, retailing, and advertising vehicles, including the Vehicle equipped with Defendant's Autopilot system.

118.    Defendant manufactured, designed, assembled, tested, inspected, marketed, distributed, and sold their vehicles, including the Vehicle Mr. Hensley was driving the morning it malfunctioned and led to his death, and their component parts including Defendant's Autopilot system and suite of driver assistance features technology with defects in design which made them dangerous, hazardous, and unsafe for their intended and reasonably foreseeable use.

119.    At all material times, the Vehicle contained manufacturing defects which rendered the Vehicle unreasonably dangerous, in that:

(a)    Defects in the Vehicle caused the Vehicle to fail to adequately monitor and determine driver-engagement;

(b)    Defects in the Vehicle caused the Vehicle to fail to adequately detect and respond to obstacles in the Vehicle's path;

25

(c)     Defects in the vehicle caused the Vehicle to fail to adequately detect and respond to the end or lack of a roadway;

(d)     Defects in the Vehicle caused the Autopilot systems to fail without giving the driver adequate warning or notice that the driver needed to take over control of the Vehicle.

120.     At all material times, the manufacturing defects in the Vehicle were present before it left control of the Defendant, at the time that Defendant placed the Vehicle into the stream of commerce, and at the time of the subject collision.

121.     As a direct and proximate result of the subject Vehicle's manufacturing defects, My. Hensley suffered death and resulting damages alleged herein.

### COUNT # 4– NEGLIGENT MISREPRESENTATION

122.     Plaintiff repeats and realleges paragraphs 1-123 hereof, as if fully set forth herein.

123.     At all relevant times, Defendant Tesla, Inc. was engaged in the business of designing, manufacturing, assembling, testing, inspecting, distributing, selling, leasing, and advertising vehicles, including the subject vehicle (the "Vehicle") equipped with Tesla's "Autopilot" system. Decedent purchased the Subject Vehicle in part on representations made by Tesla in advertisements, promotional materials or elsewhere that the Autopilot (or Full Self-Driving) system would perform certain functions (e.g. detect obstacles, brake, navigate intersections, etc.)

124.     Mr. Hensley purchased and operated the Vehicle in part based upon representations made by Defendant, through its advertisements, promotional materials, marketing campaigns, public statements, and product descriptions, that its Autopilot or Full Self-Driving ("FSD") system could perform functions such as detecting obstacles, braking to avoid collisions, and navigating roadways and intersections with minimal or no driver input.

125.    Defendant made public claims—including but not limited to the statement: "All you will need to do is get in and tell your car where to go... your Tesla will do the rest"—that affirmatively conveyed that the Autopilot system offered full self-driving functionality requiring little to no driver supervision.

126.    Moreover, by naming its product "Autopilot," Defendant knowingly created a false impression among consumers—including Mr. Hensley—that its vehicles were capable of fully autonomous or self-driving operation, requiring little to no driver input. This impression, deliberately cultivated by Defendant to boost sales and strengthen brand recognition, was misleading, as the Autopilot system does not provide true autonomous or self-driving capabilities

127.    Defendant distributed marketing and advertising materials intended to underscore the false autonomous functionality of its Autopilot systems, such as but not limited to and advertisement video that showed a Tesla vehicle, equipped with Autopilot, successfully navigating from Gigafactory Texas to its new owner's home approximately thirty minutes away, crossing parking lots, highways and the city to reach its new owner and without a driver behind the wheel.[52] Defendant further reinforced this false impression through promotional content such as a video advertisement depicting a Tesla vehicle, equipped with Autopilot, driving itself from Tesla's Gigafactory to a new owner's home—navigating city streets and highways without a driver behind the wheel.

128.    In another instance, Defendant released a widely circulated video in October 2016 purporting to show a Tesla vehicle autonomously navigating roadways, stopping at red lights, and accelerating at green lights. However, the video was staged, and the depicted vehicle reportedly crashed during filming and was not operating solely through deployed Autopilot technology.

---

[52] "This Model Y drove itself from Gigafactory Texas to its new owner's home ~30min away — crossing parking lots, highways & the city to reach its new owner." https://www.youtube.com/watch?v=GU16hXSSGKs

129. These representations were materially false and misleading, as the Autopilot system, both then and now, lacks full autonomous driving capability and requires continuous driver oversight and readiness to intervene.

130. These false expectations led Mr. Hensley and similarly situated Tesla drivers to place excessive and unjustified trust in the Autopilot system's capabilities, potentially becoming inattentive behind the wheel and relying on a system not capable of performing the autonomous functions Defendant promoted.

131. Defendant made these representations without reasonable grounds for believing they were true and failed to exercise reasonable care in communicating the actual limitations of the system.

132. Defendant had a direct pecuniary interest in making and disseminating these representations to consumers, including Mr. Hensley, as such statements were intended to—and did in fact—promote the sale of Tesla vehicles and Autopilot/FSD-related upgrades and features.

133. Defendant owed a duty of care to consumers, including Mr. Hensley, to ensure that its representations concerning the Autopilot system were accurate, not misleading, and reasonably supported by evidence of actual system performance and limitations.

134. Defendant breached this duty by failing to exercise reasonable care in the dissemination of promotional and marketing materials; by omitting critical information about the system's limitations and risks; and by advertising the Autopilot system in a manner that misled consumers as to the system's actual functionality and safety profile.

135. Mr. Hensley justifiably relied on these representations in purchasing and using the Subject Vehicle and reasonably believed that the Autopilot system would function in accordance with Defendant's public statements and marketing.

136. On the date of the subject collision, Mr. Hensley was operating the Vehicle in a manner that was both intended and reasonably foreseeable by Defendant, including the engagement and reliance on the Autopilot system.

137. Defendant knew or reasonably should have known that drivers, including Mr. Hensley, would rely upon the Autopilot system in the manner encouraged by its advertising, branding, and public statements.

138. As a direct and foreseeable result of Defendant's misrepresentations, Mr. Hensley placed trust in the Autopilot system to safely operate the Vehicle. That trust, cultivated by Defendant's marketing and representations, ultimately led to the fatal incident giving rise to this action.

139. As a direct and proximate result of such reliance, Mr. Hensley suffered pecuniary harm and, ultimately, death—sustaining losses including but not limited to vehicle damage, medical expenses, funeral expenses, lost income, and other compensable injuries as will be proven at trial.

140. As a direct and proximate result of Defendant's negligent misrepresentations and omissions, Mr. Hensley suffered death and his estate and beneficiaries sustained damages, including wrongful death damages, as set forth herein.

## COUNT # 5 – UNFAIR TRADE PRACTICES
## (Violation of the South Carolina Unfair Trade Practices Act – S.C. Code Ann. 39-5-10 et seq.)

141. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

29

142.     Plaintiff hereby alleges that Defendant has engaged in unfair, deceptive, and misleading trade practices in violation of South Carolina law, specifically S.C. Code Ann 39-5-20, (hereinafter "UTPA") which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

143.     The terms "trade" and "commerce" include advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value whatever situate, and include any trade or commerce directly or indirectly affecting the people of South Carolina, including the advertisements by Defendant Tesla that induced Mr. Hensley into purchasing the subject Vehicle.

144.     The activities and conduct by Defendant Tesla described herein constitute "trade" and/or "commerce" as those terms are defined and contemplated by the UTPA, affect the public interest and are capable of repetition.

145.     The conduct of Defendant, as set forth herein and occurring in the context of trade and commerce, constitutes unfair and deceptive acts or practices in violation of public policy, and is unfair, offensive to public policy, immoral, unethical, and/or oppressive, and is deceptive and/or has the tendency to deceive regarding the particulars, including but not limited to the following:   partic

(a)     Defendant knowingly designed and programmed its vehicles to operate beyond the intended functional limitations of their semi-autonomous features, including Autopilot and Full- Self Driving (FSD). Specifically, Tesla vehicles were marketed and configured to operate on a wide variety of roads, including single-lane and rural roadways without consistent or clear lane marking – despite Tesla's internal knowledge that these systems were only reliably functional on controlled-access, multi-lane highways with standardized markings. Tesla failed to adequately disclose this critical limitation to consumers;

(b)    Defendant further misled the public by promoting its vehicles as safer alternatives to traditional vehicles, publicly claiming that Tesla models equipped with Autopilot and Full Self Driving mode result in fewer accidents. In making these representations, Tesla ignored or concealed statistical evidence showing that its vehicles have been involved in fatal crashes at higher rates than other major automobile brands. These claims were made without adequate scientific or independent validation, and were designed to mislead consumers into a false sense of security regarding Tesla's safety performance;

(c)    Additionally, Defendant failed to adequately warn users that activation of the Autopilot system and Full Self Driving mode may cause drivers to become disengaged or experience delayed reaction times in emergency situations. Tesla continued to market its driver-assistance technology as requiring only minimal or no supervision, thereby undermining consumer awareness of the need to remain alert and responsive while operating the vehicles and using those features. This omission was deceitful, particularly given Tesla's repeated assertions that's its vehicles were approaching or had achieved autonomous operations.

(d)    Despite being repeatedly warned – through regulatory inquiries, consumer complaints, independent safety studies, and internal data – Tesla has continued to advertise, promote, and publicly endorse its vehicles as having autonomous capabilities that do not exist. Defendant's CEO, Elon Musk, and other company representatives have routinely issued public statements and shared promotional videos exaggerating or misrepresenting the true nature of Tesla's driving systems. Tesla has made no meaningful effort to correct these misrepresentations or modify its advertising strategy, thereby perpetuating a widespread and ongoing consumer deception.

146.    Defendant's unfair and deceptive practices have a significant impact on the public interest in that the acts and practices have the potential for repetition, have occurred in the past, thus making it likely they will continue to occur absent deterrence in the following particulars:

(a)　Despite repeated and clear reminders from regulatory bodies, consumer safety advocates, and the public, Defendant has consistently failed to modify its naming, advertising, and marketing practices, all of which misled consumers regarding the true capabilities of its vehicles. Tesla's persistent failure to correct these misleading representations has perpetuated consumer confusion and fostered unrealistic expectations about the safety and autonomy of its vehicles. Each time an opportunity arises to correct these deceptive practices, Defendant has chosen to continue its misleading course of conduct.

(b)　Defendant's software updates are focused on addressing only minor inconveniences or superficial issues, and the updates continue to occur with regularity. Instead of implementing meaningful changes that could reduce accidents and save lifes, Defendant has chosen to prioritize updates that do little to mitigate the more significant risks posed by the flawed design and operation of its systems. As a result, the same fatal accidents, like that of Mr. Hensley, continue to happen.

(c)　Defendant has been repeatedly notified by regulators, industry experts, and concerned parties about the risks associated with the misuse of its Autopilot and FSD systems. Despite these numerous warnings, Defendant has failed to take adequate steps to guard against the dangerous misuse of its system, leaving consumers exposed to unnecessary risk. Tesla has been repeatedly advised to implement stronger safeguards, clearer warnings, and more comprehensive driver monitoring, yet it has continually disregarded these notifications, resulting in ongoing incidents involving the dangerous misuse of its technology, like that of Mr. Hensley. Defendants' refusal to adequately address these concerns demonstrates a blatant disregard for consumer safety and a willingness to prioritize its brand image and financial interests over the lives and well-being of its customers.

147.　As a direct result of Defendant's unfair and deceptive practices, Plaintiff has suffered monetary loss, property loss, and death.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant, awarding actual damages for the financial loss, property damage, and emotional distress suffered as a result of Defendant's unfair and deceptive practices, punitive damages to punish Defendant's willful misconduct and deter future violations, statutory damages as provided under the South Carolina Unfair Trade Practices Act, prejudgment and post judgment interest, attorney's fees and costs incurred in bringing this action, and any other relief the Court deems just and proper.

## WRONGFUL DEATH DAMAGES

148.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

149.    This wrongful death action is brought pursuant to the provisions of § 15-51-10, *et seq.*, of the South Carolina Code of Laws, on behalf of Decedent William Hensley.

150.    The death of William Hensley was caused and occasioned by the negligent, grossly negligent, reckless, willful and wanton acts of the Defendants, as set forth above.

151.    As a direct and proximate result of the negligent and grossly negligent acts, omissions, willful and wanton conduct of Defendant, the Decedent's heirs have been damaged and suffered as follows:

(a)    Loss of financial, economic support and contribution of the deceased;

(b)    Extreme mental shock and suffering;

(c)    Extreme wounded feelings;

(d)    Tremendous grief and sorrow;

(e)    Loss of friendship and companionship; and,

(f)     Deprivation of the use and comfort of the deceased's society, knowledge, judgment, and experience.

152.    The Plaintiff is informed and believes that she and the heirs for the Decedent's estate are entitled to judgment against the Defendants for their injuries and damages suffered by the deceased, as well as the Plaintiff.

153.    As a direct and proximate result of the aforementioned acts on behalf of the Defendant, the Decedent unjustifiably suffered and died, and, further, the Plaintiff has suffered ACTUAL, CONSEQUENTIAL, and PUNITIVE DAMAGES, together with costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## **PUNITIVE DAMAGES**

154.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

155.    Defendant's wrongful conduct as described herein was motivated solely by unreasonable financial gain.

156.    Defendant designed, marketed, and deployed its advanced driver-assistance system with actual knowledge that the system could not reliably detect or respond to foreseeable roadway hazards—including cross-traffic, stopped vehicles, pedestrians, roadway control devices, and non-highway intersections—yet affirmatively chose to place the system into consumer vehicles without adequate restrictions, safeguards, or fail-safe mechanisms.

157.    Defendant knew or should have known that ordinary drivers would rely upon the system in situations beyond its safe capabilities, particularly given Defendant's own marketing, branding, and public representations suggesting that the system could safely operate with minimal human intervention.

158.     Despite this knowledge, Defendant knowingly permitted and encouraged use of the system outside its safe operational design domain, including on surface streets, intersections, and roadways involving mixed traffic and vulnerable road users, thereby creating a foreseeable and unreasonable risk of serious injury or death.

159.     Defendant consciously chose not to implement readily available safety measures, including but not limited to:

    a.  Restricting system operation to roadway environments for which it was designed;

    b.     Implementing effective driver-monitoring systems capable of detecting visual and cognitive disengagement;

    c.     Designing mandatory disengagement protocols when system limitations were reached; and

    d.     Providing clear, prominent and consistent warnings commensurate with the system's known limitations.

160.     Upon information and belief, at the time of the collision, the Autopilot system in Mr. Hensley's Tesla was activated but failed to properly detect and/or effectively respond to the road conditions or the presence of the trees.

161.     Upon information and belief, the autopilot system failed to engage any braking, deceleration, or steering to prevent the fatal collision.

162.     Upon information and belief, the Autopilot system failed to effectively notify Mr. Hensley of any need to engage braking, deceleration, or steering to prevent the fatal collision.

163. Defendant, through its officers, employees, and agents, knew that the vehicle at issue had an Autopilot system that was not fully tested for safety and was not designed to be used on roadways with cross-traffic, intersecting roadways or any roadways that are not multi-lane roadways. Nevertheless, Defendant programmed Autopilot to allow it to be used on roadways that Defendant knew were not suitable for its use and knew would result in fatal accidents resulting in death and/or serious injury to innocent people such as Plaintiff.

164. The unreasonably dangerous nature of Defendant's conduct, together with the high likelihood of injury resulting from the conduct, was known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of Defendant.

165. Defendant's failure to implement such measures was not the result of inadvertence or oversight, but rather a deliberate corporate decision to prioritize product deployment, market positioning, and competitive advantage over consumer safety.

166. Despite repeated internal and external indicators that Autopilot failed to detect cross-traffic, pedestrians, and roadway control devices, Defendant consciously chose not to modify, restrict, or recall the system, evidencing a conscious disregard for public safety.

167. Despite knowledge of these deficiencies, Defendant advertised Autopilot in a way that greatly overestimated its capabilities and hid its deficiencies. Defendant knew that Autopilot was unable to appropriately detect and respond to in-path obstacles or the end of a roadway.

168. The Defendant, through marketing materials and public statements by senior executives, affirmatively overstated Autopilot's capabilities, including claims that it performed better than a human driver, thereby inducing foreseeable over-reliance by ordinary consumers.

169. At all times material hereto and prior to the subject crash, Defendant had specific knowledge through its officers, directors, managers, and/or other employees/agents, including its CEO Elon Musk, that its product was defective and would not properly and safely avoid

36

impacting obstacles in its path or effectively warn drivers of their need to intervene to avoid collision.

170. At all times material hereto and prior to the subject crash, Defendant had specific knowledge through its officer, directors, managers, and/or other employees/agents, including its CEO Elon Musk, that its product was defective based on, among other things, inadequate design testing, and manufacture of the Autopilot system.

171. At all times material hereto and prior to the subject crash, Defendant had specific knowledge through its officers, directors, managers and/or other employees/agents, including its CEO Elon Musk, that its product was defective based on government investigations, recommendations, and warnings provided by the National Transportation Safety Board and the National Highway Traffic Safety Administration.

172. At all times material hereto and prior to the subject crash, Defendant had specific knowledge through its officers, directors, managers and/or other employees/agents, including its CEO Elon Musk, that its product was defective based on numerous prior incidents and collisions in which its safety systems on Tesla vehicles partially or completely failed, causing significant property damage, severe injury and catastrophic death to its occupants.

173. At all times material hereto and prior to the subject crash, Defendant failed to correct its defective product and instead continued to mislead the public, including Mr. Hensley, as to the purported capabilities and safety of the product through the public statements of the company and statements by its CEO Elon Musk, despite having the foregoing knowledge.

174. Defendant acted with conscious disregard by continuing to represent the system as safe and reliable after receiving internal and external information—including prior incidents, crash data, user reports, and industry warnings—demonstrating that the system failed to perform as consumers were led to expect in foreseeable driving scenarios.

175. Defendant's conduct created a situation in which drivers were predictably induced to over-trust the system and then blamed when the system failed under conditions Defendant knew it could not safely handle.

176. Following foreseeable crashes and injury-producing events, Defendant failed to fully and transparently disclose, preserve, and timely produce system performance data, further evidencing a corporate culture that deprioritized safety accountability and impeded the identification and correction of known defects.

177. Defendant's conduct created a situation in which drivers were predictably induced to over-trust the system and then blamed when the system failed under conditions Defendant knew it could not safely handle.

178. Notwithstanding the Defendant's knowledge of the inadequacy of its safety systems, CEO Elon Musk, in a cost savings measure, overrode the recommendations of his own engineers by ordering the removal of radar sensors from its newer cars and deactivating the radar sensors on cars already in possession of consumers. As a result, the Autopilot system relied solely on the vehicle's camera systems, which were inadequate to identify all obstacles in the path of the vehicle.[53]

179. The conduct of Defendant was motivated by financial gain and by a desire to gain market share. Defendant and its CEO Elon Musk specifically made the decision to continue to profit from the sales of their defective vehicles without taking the appropriate steps to ensure the safety of its occupants and others.

180. At all times material hereto, Defendant engaged in intentional misconduct or gross negligence in the following manner:

---

[53] https://electrek.co/2023/03/21/tesla-engineer-convince-elon-musk-not-give-up-radar-self-driving/#:~:text=The%20report%20goes%20as%20far,Autopilot%20and%20Full%20Self%2DDriving.

(a)    Failing to geofence the Autopilot system and allowing the Autopilot system to be used outside of Defendant's stated operational design domain (ODD) on non-controlled access roadways;

(b)    Failing to modify, restrict or recall the Autopilot system ;

(c)    Making public statements that its Autopilot technology is far more capable than it actually is;

(d)    Relying on radar to detect obstacles despite established history of crashes and concerns raised to and with Defendant;

(e)    Failing to re-train its computer vision dataset to include different lighting conditions;

(f)    Failing to provide adequate warnings in the owner's manual that the Autopilot system has problems detecting the end of roadways and obstacles;

(g)    Failing to conduct adequate testing of both its radar and computer vision systems;

(h)    Failing to adequately train senior Tesla engineers and employees on basic information such as ODD and the need for consideration of human factors when designing and implanting its Autopilot system;

(i)    Failing to use audible and tactile technology to effectively prompt the driver to fully engage in the driving task;

(j)    Failing to utilize human factors expertise and/or human factors consultants in the design and creation of its warnings and user interfaces;

(k)     Failing to conduct testing to determine adequate perception/reaction times of the Autopilot system;

(l)     Failing to provide adequate supervision and quality assurance of subcontractors involved with the Autopilot system;

(m)     Failing to alert drivers while engaged in Autopilot that the Tesla vehicle is no longer in Tesla's designated ODD;

(n)     Failure to warn and restrict operation of Autopilot to the areas in which it was designed to operate;

(o)     Faling to keep with known standards; and,

(p)     Failing to use reasonable care and practical engineering principles under all the relevant circumstances.

181.     At all times material hereto, Defendant had actual knowledge of the wrongfulness of its conduct and the high probability that injury or damage to people such as Mr. Hensley would result and, despite that knowledge, intentionally pursued the foregoing course of conduct, resulting in Mr. Hensley's death. In other words, the Defendant's conduct rises to the level of intentional misconduct, and an award of punitive damages is proper.

182.     At all times material hereto, the conduct of Defendant was so reckless or wanting in care that it constituted a conscious disregard and indifference to life, safety, or rights of people like Mr. Hensley. In other words, the Defendant's conduct rises to the level of gross negligence, and an award of punitive damages is proper.

183.    Again, one of the clearest demonstrations of Defendant's indifference to safety has been that, despite the National Highway Traffic Safety Administration's (NHTSA) identification of severe deficiencies in the Autopilot system, Defendant has done little, if anything, to address the regulator's concerns.[54]

184.    The wrongful conduct of Defendant was motivated solely by unreasonable financial gain, and the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was known by the managing agent, director, officer or other persons responsible for making policy decisions on behalf of Defendant.

185.    As a direct and proximate result of Defendant's misconduct, Plaintiffs suffered grievous harm. Defendant's conduct was a substantial factor in causing such harm and warrants the imposition of punitive damages to punish Defendant and deter similar misconduct in the future.

186.    An award of punitive damages is necessary and appropriate to:

a.      Punish Defendant for knowingly placing an unreasonably dangerous product into the stream of commerce;

b.      Deter Defendant and others from prioritizing marketing and market share over human safety; and

c.      Protect the public from future harm arising from similar conscious disregard of known risks.

WHEREFORE, Plaintiffs demand judgment for punitive damages against Defendant together with post-judgment interest and taxable costs incurred in this action.

---

[54] https://techcrunch.com/2023/12/20/tesla-autopilot-recall-consumer-reports/

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs pray for judgment against Defendant as follows:

1. On the past and future medical expenses incurred to the judgment;

2. On the loss of future earnings and earning capacity to judgment;

3. On other past and future special damages incurred to the judgment;

4. On the general damages for pain and suffering to judgment;

5. Costs of suit expenses, according to proof;

6. Wrongful Death Damages as set out above;

7. Punitive Damages; and

8. Other relief this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

**BELL LEGAL GROUP, LLC**

s/ J. Ryan Heiskell
J. Ryan Heiskell (Fed #*10112)*
J. Edward Bell
219 N. Ridge Street
Georgetown, SC 29440
TEL: (843) 546-2408
FAX: (843) 546-9604
 rheiskell@belllegalgroup.com

***ATTORNEYS FOR PLAINTIFFS***

June 9, 2026
Georgetown, SC